**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| WESTERN HERITAGE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 4:13-CV-00034-DGK |
| v. | ) ) | |
| PARRISH LOVE d/b/a ASPHALT WIZARDS, FUN SERVICES OF KANSAS CITY, INC., DOES 1-50, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Western Heritage Insurance Company ("WHIC") brought the instant Declaratory Relief action in connection with an underlying class action against its insured, Parrish Love d/b/a Asphalt Wizards ("Asphalt Wizards"), alleging unsolicited faxes were sent in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").  The underlying class, led by named plaintiff Fun Services of Kansas City, Inc. ("Fun Services") seeks statutory damages of $500 per claimed violation of the TCPA, *i.e.*, $500 for each of the 44,642 faxes allegedly sent from February of 2005 to March of 2008.[1]  Significantly, this $500 sought per claim is *less than* the annual per-claim deductible in the WHIC Policies of $1,000.  Since WHIC is only obligated to pay amounts in excess of the per-claim deductible and no such amounts exist here, it is entitled to summary judgment.

---

[1] Fun Services stated in discovery that it is not seeking the "treble damages" of $1,500 available for "willful" violations of the TCPA.  Ex. 20, Defendant Fun Services's Objections and Responses to Plaintiff Western Heritage's First Set of Interrogatories Directed to Defendant Fun Services of Kansas City, Inc., p.9, Interrogatory No. 22.  Such damages would be excluded under the policy's punitive damage exclusion in any event.

Alternatively, if the deductible applies on a "per claimant" basis, WHIC submits the Court should find that Fun Services and the insured must prove that a given claimant received at least three faxes during a single policy year in order to recover anything. Fun Services is claiming $500 per fax. The deductible is $1,000 per claimant per year. As such, if a given claimant received two or fewer faxes in a given policy year, it is claiming only $1,000 for that policy year and does not seek any amount in excess of the $1,000 deductible.

WHIC also seeks partial summary judgment that (1) it owes no coverage obligation under its 2006-07 Policy based on the express exclusion for TCPA violations like the ones alleged in the underlying action, (2) the "prior publication" exclusion applicable to "advertising injury" coverage limits bars coverage for such "advertising injury" under the 2005-07 Policies, and/or (3) the insured's faxed advertisements did not constitute a "products-completed operations" risk as a matter of law, such that the "products-completed operations" $2 million aggregate limit is inapplicable.[2]

## II.     STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.     Defendant Parrish Love dba Asphalt Wizards ("Asphalt Wizards") provides asphalt and paving services in the Greater Metropolitan Kansas City Area. Ex. 1, Deposition of Parrish Love, p. 41:22-25.

2.     Plaintiff Western Heritage Insurance Company ("WHIC") issued three consecutive commercial general liability policies to named insured Parrish Love

---

[2] This motion does not purport to address each and every coverage defense available to Western Heritage under the policy and governing law. There are additional defenses based on the definition of "occurrence," the exclusions for intentional acts and/or knowing violations of the rights of others, the "anti-stacking" clause, the definition of "advertising injury," the definition of "advertisement" and many others. All rights are reserved to litigate these defenses in future proceedings and there is no intention to waive such defenses.

dba Asphalt Wizards that were effective from May 18, 2004 through May 18, 2007 (collectively, "WHIC Policies"):

    a.    Policy No. SCP0510323, effective from May 18, 2004 to May 18, 2005 ("2004-05 Policy"). Ex. 2.

    b.    Policy No. SCP0553453, effective from May 18, 2005 to May 18, 2006 ("2005-06 Policy"). Ex. 3.

    c.    Policy No. SCP0600069, effective from May 18, 2006 to May 18, 2007 ("2006-07 Policy"). Ex. 4.

3.    Western Heritage is a surplus lines insurer in the State of Missouri. Ex. 2, p. WHIC 00944; Ex. 3, p. WHIC 01081; Ex. 4, p. WHIC 00992.

4.    The 2004-2007 WHIC Policies cover amounts the insured becomes legally obligated to pay as a result of "property damage" caused by an "occurrence" as the policies define those terms. Ex. 2, p. WHIC 00956; Ex. 3, p. WHIC 01093; Ex. 4, p. WHIC 01028.

5.    The 2004-07 WHIC policies define "occurrence" to include "continuous or repeated exposure to substantially the same general harmful conditions." Ex. 2, p. WHIC 00969; Ex. 3, p. WHIC 01106; Ex. 4, p. WHIC 01041.

6.    The 2005-07 WHIC Policies contain an endorsement entitled "Non-Stacking of Limits Endorsement," which states in pertinent part: "If any Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same claim for damages, the maximum Limit of Insurance for Liability Coverage under all of the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable Limit of Insurance available under any one

3

Coverage Form, Coverage Part or policy."  Ex. 3, p. WHIC 01123; Ex. 4, p. WHIC 01059.

7.       The 2004-2007 WHIC Policies cover amounts the insured becomes legally obligated to pay as a result of specifically enumerated "advertising injury" offenses as defined in the policies.  Ex. 2, p. WHIC 00960-00961; Ex. 3, p. WHIC 01097-01098; Ex. 4, p. WHIC 01032-1033.

8.       The 2004-2007 WHIC Policies contain a $1 million per occurrence limit and a $2 million general aggregate limit.  Ex. 2, p. WHIC 00953; Ex. 3, p. WHIC 01090; Ex. 4, p. WHIC 01024.

9.       The 2004-07 WHIC Policies each contain a Deductible Liability Insurance Endorsement that sets forth a $1,000 "per-claim" deductible of $1,000 for "property damage" and "advertising injury" claims applicable to "all damages sustained by one person or organization as the result of any one claim."  Ex. 2, p. WHIC 00976; Ex. 3, p. WHIC 01116; Ex. 4, p. WHIC 01052.

10.      The 2004-07 WHIC Policies each contain a "prior publication" exclusion that negates coverage for "'personal and advertising injury' arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.'"  Ex. 2, p. WHIC 00961; Ex. 3, p. WHIC 01098; Ex. 4, p. WHIC 01033.

11.      The 2004-07 WHIC Policies define the "products-completed operations hazard" to include "property damage" occurring away from the insured's premises and arising out of the insured's "product" or "work" as the policy defines those terms,

as long as such work has been "completed." Ex. 2, p. WHIC 00970; Ex. 3, p. WHIC 01106; Ex. 4, p. 01041.

12. The 2004-07 WHIC Policies define the insured's "product" to mean, in pertinent part: "any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: [¶] (a) You; (b) Others trading under your name; or (c) A person or organization whose business or assets you have acquired; and [¶] (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. [¶] Includes (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'; and [¶] (2) The providing of or failure to provide warnings or instructions." Ex. 2, p. WHIC 00970-00971; Ex. 3, p. WHIC 01107; Ex. 4, p. 01042.

13. The 2004-07 WHIC Policies define the insured's "work" to mean: "(1) Work or operations performed by you or on your behalf; and [¶] (2) Materials, parts or equipment furnished in connection with such work or operations. [¶] Includes [¶] (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work', and [¶] (2) The providing of or failure to provide warnings and instructions." Ex. 2, p. WHIC 00971; Ex. 3, p. WHIC 01107; Ex. 4, p. 01042.

14. The 2004-07 WHIC Policies define the term "advertisement," in pertinent part, as follows: "'Advertisement' means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services

5

for the purpose of attracting customers or supporters."  Ex. 2, p. WHIC 00967;
Ex. 3, p. WHIC 01104; Ex. 4, p. 01039.

15.     The 2006-07 WHIC Policy contains an Endorsement entitled Exclusion-Violation
of Statutes That Govern E-Mails, Fax, Phone Calls or Other Methods of Sending
Material or Information, which excludes coverage for, *inter alia*, "property
damage" or "personal and advertising injury" "arising directly or indirectly out of
any action or omission that violates or is alleged to violate. . . The Telephone
Consumer Protection Act (TCPA), including any amendment of or addition to
such law. . . ."  Ex. 4, p. WHIC 01043.

16.     In 2005, Asphalt Wizards hired a company known as Profax to fax a one-page
advertisement for asphalt and paving services to companies in the Greater
Metropolitan Kansas City Area.  Ex. 5, Profax Invoice dated February 22, 2005.

17.     Asphalt Wizards provided Profax with an Excel list containing the fax numbers to
whom Profax was to send the ad.  Ex. 13, Deposition of Andrew Barnett, pp.
21:23-22:3.

18.     According to Profax's invoices, Profax successfully sent 44,642 faxes on behalf of
Asphalt Wizards from February of 2005 through March of 2008.  Ex. 5; Ex. 6,
Profax Invoice dated February 24, 2005; Ex. 7, Profax Invoice dated April 25,
2006; Ex. 8, Profax Invoice dated June 15, 2006; Ex. 9, Profax Invoice dated
August 22, 2006; Ex. 10, Profax Invoice dated December 11, 2006; Ex. 11,
Profax Invoice dated July 25, 2007; Ex. 12, Profax Invoice dated March 31, 2008.

19.     Profax's invoices indicate that the 44,642 faxes were sent in eight batches as
follows:

6

a. February 22, 2005 - 1452 sent.  Ex. 5.

b. February 24, 2005 - 1683 sent.  Ex. 6.

c. April 25, 2006 - 8282 sent.  Ex. 7.

d. June 15, 2006 - 8052 sent.  Ex. 8.

e. August 22, 2006 - 8279 sent.  Ex. 9.

f. December 11, 2006 - 5325 sent.  Ex. 10.

g. July 25, 2007 - 5871 sent.  Ex. 11.

h. March 31, 2008 - 5698 sent.  Ex. 12.

20. On January 7, 2008, a company known as Fun Services of Kansas City, Inc., brought a class action alleging Asphalt Wizards violated the Telephone Consumer Protection Act (47 U.S.C. § 227) by sending unsolicited faxes ("*Fun Services* action").  Ex. 14, Class Action Petition filed January 7, 2008 in case entitled *Fun Services of Kansas City, Inc. v. Parrish Love d/b/a Asphalt Wizards*, Circuit Court of Jackson County, Missouri.

21. Asphalt Wizards tendered its defense to Western Heritage, who accepted the defense under a reservation of rights in June of 2008.  Ex. 15, letter dated June 26, 2008 from Dan Curran to Parrish Love.

22. Western Heritage appointed the law firm of Brown & James to defend the *Fun Services* action.  Ex. 15.

23. During discovery in the *Fun Services* action, Asphalt Wizards and Profax stated they were unable to locate any fax transmission reports showing the identity of the fax recipients.  Ex. 13, Deposition of Andrew Barnett, pp. 22:17-24:18; Ex. 1, pp. 90:14-91:15.

24.  Asphalt Wizards' owner, Parrish Love, testified that he gave one of five Excel lists containing fax numbers to Profax, but he did not recall which one.  Ex. 16, The Affidavit of Parrish Lee Love in Opposition to Second Motion for Summary Justment [sic] Filed by Fun Services of Kansas City, Inc., ¶ 12.

25.  Fun Services asserts there were 13,267 "unique" fax numbers on the list Asphalt Wizards sent to Profax.  Ex. 17, Order Granting Class Certification dated May 24, 2010, p. 14.

26.  On October 29, 2012, Western Heritage sent Asphalt Wizards a reservation of rights letter indicating it would defend the *Fun Services* action under a reservation of rights and referencing, *inter alia*, the "per-claim" deductible of $1,000 under the 2004-07 WHIC Policies.  Ex. 18, letter dated October 29, 2012 from Eric Strongin to Parrish Love, p. 3.

27.  On January 14, 2013, Western Heritage filed the instant Declaratory Relief action seeking a determination it owed no duty to defend or indemnify the underlying Fun Services action under the policy terms and provisions and governing law.  [Civil Complaint, Doc. 1.]

28.  On March 11, 2013, the *Fun Services* action was stayed pending the outcome of the Declaratory Relief Action pursuant to the stipulation of the parties.  Ex. 19, Order dated March 11, 2013.

29.  On June 7, 2013, Western Heritage filed the operative First Amended Civil Complaint in the Declaratory Relief Action.  [First Amended Civil Complaint, Doc. 31.]

30.    Fun Services claims that Asphalt Wizards is responsible for statutory damages in the amount of $500 for each of the faxes Profax allegedly sent on Asphalt Wizards' behalf from February of 2005 to March of 2008.  Ex. 20, pp. 8-9.

III.    **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

A.    **WHIC Owes No Duty to Pay Damages Based on the $1,000 "Per-Claim" Deductible, Which Exceeds the $500 Sought for Each TCPA Violation**

1.    **The Courts Have Found the Term "Claim" Unambiguously Refers to a Third Party's Claim or Assertion of a Legal Right**

Since each TCPA claim in the *Fun Services* action seeks *less than* WHIC's "per claim" deductible, the Court should find that Western Heritage owes no duty to pay damages as a matter of law.  The 2004-07 WHIC policies each contain a "per-claim" deductible of $1,000 for "property damage" and "advertising injury" claims, respectively.  (UF 9.)[3]

In interpreting the term "claim" as used in liability policies, the courts have found that it unambiguously refers to a third party's demand for damages or other relief:  "Courts have found that the term 'claim' as used in liability insurance policies is unambiguous and generally means a demand by a third party against the insured for money damages or other relief owed. [Citations omitted.]"  *Home Ins. Co. of Illinois v. Spectrum Info. Tech.*, 930 F.Supp. 825, 847 (E.D.N.Y. 1996) (citations omitted).

2.    **The Eighth Circuit Has Held When Multiple Claims Are Brought in a Single Suit, the Per-Claim Deductible Applies Separately to Each**

Moreover, the Eighth Circuit has held that when multiple "claims" are aggregated into a single action, the "per-claim" deductible applies to each claim separately.  In *Capitol Indemnity Corporation v. Miles*, 978 F.2d 437 (8th Cir. 1992), the insured contracted to spray exterior foam

---

[3] This motion is not directed to and does not address the substantive coverage issue of whether the alleged TCPA violations implicated coverage under the "property damage" and/or "advertising injury" coverages. WHIC reserves the right to raise defenses to these claims in other proceedings and/or at trial.

Case 4:13-cv-00034-DGK   Document 67   Filed 10/23/13   Page 9 of 23

installation on a building. In so doing, it allegedly damaged 130 vehicles parked near the building. The vehicle owners made claims against the building owner. The building owner settled the claims and sued the insured for contribution. The insured demanded his liability insurer pay his defense and indemnity costs minus a single per-claim deductible. The insurer declined on the ground that each vehicle owner's claim was for less than the $500 per-claim deductible. The trial court agreed with the insured, finding a single per-claim deductible of $500 applied. *Id*. at 437-38.

The Eighth Circuit reversed. In so doing, the Court held that the majority of courts who have considered the issue have declined to apply a single per-claim deductible when the claim in question is actually an aggregation of multiple different claims:

> [C]ases hold, we think quite properly, that if a person buys up the claims of damaged persons, aggregates them into a kind of "superclaim," and then sues the insured, the insured cannot successfully assert against his insurer that there is only one claim and therefore only one deductible applicable against him. [Citation omitted.] The same result follows, we think as a matter of course, if the claimant against an insured is a subrogee of various individual claimants and the insured asserts that only one claim is being made against him. [Citation omitted].

*Id*. at 438-39. Therefore, the Eighth Circuit held that when multiple claims are aggregated into a single "claim," the per-claim deductible applies separately to each claim.

### 3. Other Courts Across the Country Have Applied the Per-Claim Deductible Separately to Multiple Claims in a Single Suit

The courts of other jurisdictions have likewise held that the "per-claim" deductible applies separately to each claim when multiple claims against the insured are brought in a single suit. *Pennsylvania Home Improvement Co. v. American Casualty Co.*, 47 Berks 285 (Pa. 1955) (insurer's demurrer sustained on the ground that none of the multiple claims that the insured damaged vehicles with mastic spray exceeded the policy's $50 per-claim deductible); *Kent Ins. Co. v. Capitol Maintenance, Inc.*, 433 So.2d 1295, 1297 (Fla. 1983) ($1,000 per-claim deductible

applied separately to multiple claims for spray-paint damage to vehicles); *General Cas. of Wisconsin v. Diversified Painting Service, Inc.*, 603 N.E.2d 1389, 1391 (Ind. 1992) (insurer was entitled to summary judgment that its $250 per-claim deductible applied separately to the claims of each of the 60 to 80 vehicles the insured damaged with paint overspray); *Combined Communications v. Seaboard Surety Co.*, 641 F.2d 743, 745 (9th Cir. 1981) ($5,000 per-claim deductible applied separately to each claim arising out of the insured's radio and television broadcasts); *Lamberton v. Travelers Indemnity Co.*, 325 A.2d 104, 108 (De. 1974) ($10,000 per-claim deductible applied separately to the claims of eight workers injured when a bridge that the insured designed collapsed); *St. Paul Fire and Marine Ins. Co. v. Hawaiian Ins. & Guaranty Co.*, 2 Haw.App. 595, 597 (Haw. 1981) (allegations the insured doctors negligently administered anesthesia on three separate occasions constituted three separate "claims" under per-claim policy limit provision); *Washington Occupational Health Associates, Inc. v. Twin City Fire Ins. Co.*, 670 F.Supp. 12, 16 (U.S.D.C. D.C. 1987) (separate $10,000 per-claim deductible applied to each of the 18 building engineers who sued the insured for exposure to toxins); *Burlington County Abstract Co. v. QMA Associates, Inc.*, 167 N.J.Super. 398, 409 (separate $500 per-claim deductible applied to claims of 84 condominium owners against the insured title abstract company for failing to ensure payment of back taxes prior to closing).

### 4. The Courts Have Rejected the Notion That a Class Action Constitutes a Single "Claim" Subject to One Deductible

Other courts have expressly held that a class action implicates multiple claims subject to separate per-claim deductibles. In *Muscemi v. Schwegmann Giant Super Markets*, 332 F.3d 339 (5th Cir. 2003), the claimants brought a class action against the insured grocery store owner after a voucher program for employees was terminated. *Id*. at 341-42. The trial court held that the

insurer's self-insured retention ("SIR")[4] applied only one time to the class claims collectively. The Court of Appeals reversed, finding the SIR applied separately to each class claim. *Id*. at 342. In so holding, the Court of Appeals noted that most courts define the term "claim" as an individual cause of action. *Id*. at 354. It cited to *Maxim Manufacturing v. Alliance General Ins. Co.*, 911 F.Supp. 239 (S.D. Miss. 1995), in which the court held the SIR was triggered twice by a lawsuit for the wrongful death of two children killed in a fire. The *Muscemi* Court further cited to *Colbert County Hospital v. Bellefonte Ins. Co.*, 725 F.2d 651 (11th Cir. 1984), in which the court held that the "per-claim" policy limit applied separately to each of three operations the defendant doctor performed on the claimant. *Muscemi v. Schwegmann, supra*, 332 F.3d at 354.

Other courts have confirmed that multiple "per-claim" deductibles apply to class actions. In *Vargas v. Hudson County Bd. of Directors*, 949 F.2d 665 (3d. Cir. 1991), the Court upheld the trial court's application of a $100 per-claim deductible to the individual class claims alleging a conspiracy to prevent the claimants from voting for mayor. *Id*. at 674-75.

Here, the TCPA states that each unsolicited fax sent constitutes a separate violation. 47 U.S.C. § 227 (b)(3)(B). In keeping with this, the *Fun Services* action seeks $500 for *each fax* sent in violation of the TCPA. (UF 30.) Significantly, Asphalt Wizards bargained and paid for coverage that was subject to a $1,000 *per claim* deductible. Inasmuch as each claim for statutory damages of $500 under the TCPA is *less than* the $1,000 per claim deductible, WHIC has no payment obligation as a matter of law.[5]

---

[4] An SIR is similar to a deductible in that the insured itself agrees to be responsible for the amount of the self-insured retention. *See U.S. Fidelity & Guarantee Ins. Co. v. Commercial Union Midwest Ins. Co.*, 430 F.3d 929, 938 (8th Cir. 2005).

[5] The per-claim deductible provision applies to legal expenses such as defense costs as well as to indemnity amounts. As stated above, WHIC has been defending the *Fun Services* action under a reservation of rights and has expended defense costs. Even assuming the defense costs were $100,000, however, Fun Services alleges there were 33,073 faxes sent during WHIC's 2004-07 policy periods. Dividing the hypothetical $100,000 in defense costs by 33,073 yields $3 in defense costs per fax, whereas

**B.** **Assuming the Deductible Applies on a "Per-Claimant" Basis, Fun Services Has Not Proven Any Claimant Received *Three or More* Faxes During a Single Policy Year as Required to Exceed the $1,000 Per-Claim Deductible**

Fun Services might assert that the deductible applies on a "per claimant" basis. However, the language of the deductible states it applies on a "per claim," "per claimant" basis. (UF 9.) Even assuming the deductible applied solely on a "per-claimant" basis, however, the $1,000 deductible applies *separately* to faxes sent during the 2004-05, 2005-06 and 2006-07 policy periods, respectively. This being the case, a given claimant would need to receive three or more faxes (at $500 a fax) during a single policy year to exceed the $1,000 deductible. If the claimant received two or fewer faxes during a single policy year, its damages would fall within the $1,000 deductible for that year.

In *Alea London Ltd v. American Home Services, Inc.*, 638 F.3d 768 (11th Cir. 2011), the court considered a deductible applying on a "per-*claimant*"[6] basis in the context of a TCPA class action against the insured. The policy contained a per-claimant deductible of $500. The deductible read in pertinent part: "Property Damage Liability $500 per claimant [¶]. . . Advertising Injury Liability $500 Per Claimant." *Id.* at 771. The trial court in *Alea* granted summary judgment to the insurer on the issue of the per-claimant deductible, finding that it applied to the "advertising injury" of each class claimant. *Id.* at 772-73.[7] The Court of Appeals affirmed. In so doing, the court found that the language of the per-claimant deductible was plain and clear: "[T]his schedule plainly provides for a deductible of $500 per claimant for

---

the applicable per-claim deductible is $1,000 per fax.

[6] The deductible at issue in *Alea London Ltd v. American Home Services, Inc.*, 638 F.3d 768 (11th Cir. 2011) was distinguishable from the deductible here, which also applies on a "per-claim" basis.

[7] The trial court in *Alea London Ltd v. American Home Services, Inc.*, *supra*, 638 F.3d 768, 772-73, found on summary judgment that the underlying TCPA complaint alleged "advertising injury," and the insurer did not appeal this ruling.

Advertising Injury Liability." *Id*. at 774. As such, the Court held, the deductible was unambiguous: "These plain words are not susceptible to more than one meaning." *Id*. at 775. Therefore, the court concluded that as a matter of law, the insurer was only responsible for amounts each claimant sought in excess of the "per-claimant" deductible. *Id*. Thus, the *Alea* Court held that the per-claimant deductible was unambiguous and applied separately to each claimant and the TCPA class action.

Moreover, the insured bears the burden of establishing the amount in excess of the per-claim deductible (since the deductible provision is a basic part of policy coverage). *Reedy Industries, Inc. v. Hartford Ins. Co.*, 306 Ill.App.3d 989, 715 N.E.2d 728 (1st Dist. 1999); *Appalachian Ins. Co. v. United Postal Sav. Ass'n*, 422 So.2d 332 (Fla. App. 1982), review denied, 430 So.2d 452 (Fla. 1983); *Evans v. Pacific Nat'l Fire Ins. Co.*, 367 S.W.2d 85 (Tex. Civ. App. 1963), error refused (July 10, 1963); *Compagnie Des Bauxites de Guinee v. Insurance Co. of N. Am.*, 721 F.2d 109 (3d. Cir. 1983). As such, this Court should find that unless and until the insured establishes that a given claimant received at least three faxes during the same policy year, that claimant has no damages in excess of the $1,000 per claim deductible.

**C.    The TCPA Exclusion Contained in the 2006-07 Policy Negates Any Coverage Under That Policy**

There is also no coverage under the 2006-07 policy because it contains an express exclusion of coverage for TCPA claims such as those in the *Fun Services* action. With respect to both "property damage" and "personal and advertising injury," the TCPA exclusion bars coverage for damage: "arising directly or indirectly out of any action or omission that violates or is alleged to violate [¶] a.  The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law. . . ." (UF 15.) In the instant case, the underlying class action seeks statutory damages of $500 per fax based on alleged violations of the TCPA. (UF

14

Case 4:13-cv-00034-DGK   Document 67   Filed 10/23/13   Page 14 of 23

30.)  As such, the TCPA exclusion applies to negate any coverage under the 2006-07 WHIC Policy as a matter of law.

Fun Services has argued that the TCPA exclusion is "invalid" because WHIC ostensibly did not provide "notice" that it was including the exclusion in the 2006-07 policy.  Defendant Fun Services of Kansas City, Inc.'s Answer, Affirmative Defenses, and Counterclaim to the First Amended Civil Complaint [Doc. 34].  However, there is no such requirement under Missouri law.  WHIC is a non-admitted, surplus lines carrier in Missouri.  To obtain insurance through a surplus lines insurer, an insured must demonstrate that it is *unable* to secure the type of coverage in question through an admitted insurer.  *See* Mo. Rev. Stat. §  384.017.  Non-admitted insurers are not subject to the same stringent requirements applicable to licensed insurers.  Nonetheless, insurance contracts obtained through surplus lines insurers are valid and enforceable.  Mo. Rev. Stat. § 384.038.  Furthermore, Missouri law does not require a surplus lines insurer to provide any advance notice of the inclusion of a term or provision in the policy.  To the contrary, Mo. Rev. Stat. § 384.036 specifically states an endorsement may be used to provide notice of a policy change:

> 3. If, after delivery of any such evidence of insurance, there is any change in the identity of the insurers, or the proportion of the risk assumed by any insurer, or any other material change in coverage as stated in the surplus lines licensee's original evidence of insurance, or in any other material as to the insurance coverage so evidenced, the surplus lines licensee shall promptly issue and deliver to the insured or the original producing broker an appropriate substitute for, or ***endorsement of the original document***, accurately showing the current status of the coverage and the insurers responsible thereunder.

Mo. Rev. Stat. § 384.036 (emphasis added).  As this statute shows, the Missouri Legislature is primarily concerned with changes in the identity of the insurers or their portion of the risk.  Mo. Rev. Stat. § 384.036 makes clear that regardless of the nature of the change to the policy, an endorsement is sufficient to provide notice of the change.  Moreover, Missouri case law further

15

supports this policy. *See Adams v. Manchester Insurance and Indemnity Co.*, 385 S.W.2d 359 (1964) (delivery or receipt of the policy with the attached endorsement that excludes coverage is considered communication to the policyholder of those terms). Additionally, insureds have a duty to read their renewal policies to ensure the policies contain the agreed-upon terms: "Missouri imposes an affirmative duty on insureds to examine their policies promptly in order to determine whether they contain the terms agreed upon, and the failure to do so is deemed to be the acceptance of the policy as written." *Secura Ins. Co. v. Saunders*, 227 F.3d 1077, 1081 (8th Cir. 2000).

Here, WHIC included an endorsement with the 2006-07 policy that specifically set forth the TCPA Exclusion. (UF 15.) Accordingly, the Court should find that as a matter of law, the TCPA exclusion applies and bars coverage under the 2006-07 Policy.

Fun Services has invoked a wholly inapplicable statute, Mo. Rev. Stat. § 379.845, for the argument the TCPA exclusion was invalid because WHIC did not provide 30 days' notice. However, Mo. Rev. Stat. § 379.845, by its terms, applies to the 30-day notice requirement for notices of cancellation and/or nonrenewal under the "Missouri Basic Property Insurance Inspection and Placement Program," a program for insureds without the financial wherewithal to obtain standard *property* (*i.e.*, first-party) insurance.[8] *See Graue v. Missouri Property Ins. Placement Facility*, 847 S.W.2d 779 (Mo. en banc 1993).

---

[8] Mo. Rev. Stat. § 379.810 provides:

"Program established.

There is hereby established the 'Missouri Basic Property Insurance Inspection and Placement Program' (hereinafter referred to as "program") to make available basic property insurance to persons having property interests in this state who are in good faith entitled to but who are unable to procure such coverage through ordinary methods. Such program shall provide for the equitable distribution and placement of risks among all insurers in the manner and subject to the conditions hereinafter stated."

16

Mo. Rev. Stat. § 379.845 provides that with respect to *property* insurance policies, participating licensed insurers must provide 30 days' notice of any *nonrenewal* or *cancellation*.[9] Here, a first-party property policy is <u>not</u> at issue. The insured is seeking liability coverage. Moreover, the Missouri Basic Property Insurance Inspection and Placement Program only applies to licensed insurers and not surplus lines insurers like Western Heritage. Mo. Rev. Stat. § 379.815(7).[10] (UF 3.)

Significantly, Fun Services has not mentioned the applicable statute, Mo. Rev. Stat. § 384.036,[11] and does not attempt to argue that there has been any failure to comply with the statute. Therefore, the Court should, at a minimum, grant partial summary judgment to WHIC finding that it owes no coverage under the 2006-07 WHIC Policy.

### D. The Prior Publication Exclusion Precludes any "Advertising Injury" Coverage Under the 2005-07 Policies as a Matter of Law

The policies' "prior publication" exclusion negates any coverage obligation under the 2005-07 policies. The prior publication exclusion in each of the 2004-07 Policies bars coverage for advertising injury arising from "oral or written publication of material whose first publication took place before the beginning of the policy period." (UF 10.) Numerous courts nationwide have upheld the prior publication exclusion, finding it clearly and unambiguously bars coverage when the offending material was first published prior to the policy period. *See, e.g.*, *Ringler*

---

[9] Mo. Rev. Stat. § 379.845 provides, in pertinent part: "2. Any notice of cancellation or notice of nonrenewal of a policy or binder issued under the program, together with a statement of the reason therefor, shall be sent to the insured and a copy retained by the facility. Any such notice shall be sent not less than thirty days prior to the cancellation or nonrenewal of any risk under the program to allow ample time for an application for new coverage to be made and a new policy to be written under the program."

[10] Mo. Rev. Stat. § 379.815(7) defines "insurer" for purposes of the program as "any insurance company, reciprocal or interinsurance exchange or other organization licensed and authorized by the director to write property insurance, including the property insurance components of multiperil policies, on a direct basis, in this state." Mo. Rev. Stat. § 384.015, in turn, defines a "nonadmitted insurer" like Western Heritage as "an insurer **not licensed** to do an insurance business in this state, including insurance exchanges authorized under the laws of other states." (Emphasis added.)

[11] Mo. Rev. Stat. § 384.011 to 384.071 are known as "The Missouri Surplus Lines Law."

*Associates, Inc. v. Maryland Casualty Co.*, 80 Cal. App. 4th 1165, 1185 (Cal.App.1st Dist. 2000) (no coverage for defamatory statements first published prior to the policy period); *Matagorda Ventures v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 715-16 (S.D. Tex. 2000) (since the underlying complaint revealed that the claims resulted from written materials first published before the beginning of the policy period, the suit fell outside the scope of coverage); *Superperformance Intl., Inc. v. Hartford Cas. Ins. Co.*, 332 F.3d 215, 224 (4th Cir. 2003) (prior publication exclusion barred coverage for "disparagement" claim stated in trademark infringement complaint, since the first publication took place before policy period).

In fact, many of these decisions hold that the prior publication exclusion prohibits coverage for *advertisements* first published before the policy incepts. In *Applied Bolting Tech. Prods. v. U.S. Fid. & Guar. Co.*, 942 F.Supp. 1029, 1035-37 (E.D. Pa. 1996), affd., 118 F.3d 1574 (3rd Cir. 1997), the underlying claimant alleged that the insured falsely advertised that its product met industry standards, *before* the insurer's policy incepted. *Id*. at 1032, 1035-36. The court held the policy's prior publication exclusion clearly applied to bar coverage:

> Under the exclusion's plain terms, the "first publication" date is a landmark: if the injurious advertisement was "first published" before the policy coverage began, then coverage for the "advertising injury" is excluded. [Citations omitted.] It is irrelevant that later publications, made after the policy became effective, also caused "advertising injury" or increased the damages.

*Id*. at 1036. Therefore, the *Applied Bolting* court found the prior publication exclusion barred coverage for advertising activities that pre-dated the policy. *Id.*

Other courts have also found the prior publication exclusion applies to preclude coverage for the insured's advertising activities that pre-date the policy. *United National Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 777 (9th Cir. 2009) (prior publication exclusion is "clear and explicit" and "plainly" bars coverage for "any copyright infringement injury that arose from an oral or written publication of material first published before the policy became

effective"); *Interlocken Int'l Camp, Inc. v. Markel Ins. Co.*, 2003 WL 881002, *2 (D.N.H. 2003) (first publication exclusion bars coverage for claims arising from subsequent uses of same offending material first appearing in other advertisements in different media before the policy incepted).

Moreover, one court observed that since insurance is designed to protect against fortuitous events, there is nothing to insure if the offending ad pre-dated the policy: "The purpose of insurance is to spread risk-such as the risk that an advertising campaign might be deemed tortious-and if the risk has already materialized, what is there to insure?" *Taco Bell Corp. v. Continental Cas. Co.,* 388 F.3d 1069, 1072-1073 (C.A.7 (Ill.), 2004)

In the instant case, the undisputed facts show the insured began faxing its ad for asphalt and paving services in February 2005, before the May 18, 2005 – May 18, 2007 policies incepted. (UF 20.) According to the Profax invoices, Profax first faxed the ad in February of 2005, whereas the 2005-07 policies incepted on May 18, 2005. (UF 2, 20.) Moreover, the language of the ads allegedly faxed from 2005-07 was substantively identical. (UF 20.) Since it is undisputed the ads were first sent prior to the inception of the 2005-07 policies, there is <u>no</u> "advertising injury" coverage under these policies as a matter of law. Therefore, WHIC respectfully requests that the Court grant partial summary judgment in its favor due to the fact the "prior publication" exclusion applicable to "advertising injury" bars coverage under the 2005-07 policies.

**E.** **The $2 Million Products-Completed Operations Aggregate Limit is Inapplicable, Since The Ads Were Not a Products-Completed Operations Risk**

Fun Services' assertion that a separate $2 million "products-completed operations" aggregate limit applies over and above the $2 million aggregate limit under the 2004-07 policies fails as a matter of law. [Doc. 34.] Contrary to Fun Services' contention, unsolicited faxed

19

advertisements do not constitute a "products-completed operations" risk. As an initial matter, the products-completed operations hazard is not a separate policy but a sub-part of the CGL policy. (UF 2.) As such, it covers the same types of injury or damage covered by Coverage Part A, but with respect to a different time period or location (*i.e.*, risks occurring offsite, after the insured's work is "complete"). *See Hawkeye-Security Ins. Co. v. David*, 6 S.W.3d 419, 424-25. Rather than constituting a separate coverage grant, it simply explains the amount of damages each policy covers. *American Home Assur. Co. v. Cat Tech LLC*, 660 F.3d 216, 224 (5th Cir. 2011) (applying Texas law).

The WHIC Policies define the products-completed operations hazard to refer to, *inter alia*, property damage arising offsite from the insured's *completed* operations. (UF 11.) Moreover, Courts narrowly interpret this standard policy definition of the completed operations hazard and it has been found to apply only to construction or maintenance-type work. *See American Red Cross v. Travelers Indem. Co. of Rhode Island*, 816 F.Supp. 755, 760 (D.D.C. 1993) (the plain language of the products-completed operations provision indicates it is intended to apply to construction and maintenance work, such as work performed on the premises of others by contractors and subcontractors); *CPS Chemical Co., Inc. v. Continental Ins. Co.*, 199 N.J. Super. 558 (rev'd on other grounds, 203 N.J. Super. 15 (App. Div. 1985)) (stating that "[c]ommentators are in complete agreement that this exclusion refers to accidents caused by defective workmanship which arise after completion of work by the insured on construction or service contracts").

As to what constitutes the insured's "work," the WHIC Policies specifically define "your work" to mean "work or operations" by the insured or "materials, parts or equipment furnished in connection with such work or operations." (UF 13.) In addition, the policies define "your

20

product" to mean goods or products manufactured, sold, handled, distributed or disposed of by the insured. (UF 12.) The term "your product" includes "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'" (UF 12.)

Fun Services has asserted that the advertisements constituted the insured's work, or representations concerning the fitness of the same. [Doc.34.] Significantly, however, the WHIC Policies specifically define the term "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. . . ." (UF 14.) Clearly, the policy defines making representations concerning the performance of one's actual product as different from sending "notices" to attract business. Unlike warranties concerning the fitness of the insured's product, advertisements only provide notice of the availability of the product.

Further, Fun Services has not shown and cannot show that even if the advertisements constituted the insured's work or product, such work or product was "completed" as required to constitute a products-completed operations risk. Rather than constituting or concerning "completed" work, an advertisement concerns prospective and/or desired work that has not been, and may never be started and therefore not "completed." Since the faxed advertisements thus do not fall within the definition of the "products-completed operations" hazard, the Court should find as a matter of law that the $2 million aggregate limit for such risks is inapplicable here and grant partial summary judgment in favor of WHIC on this issue.

## IV.    CONCLUSION

For the foregoing reasons, WHIC requests that this Court grant its motion for summary judgment finding that it owes no payment obligation because each claim for $500 in statutory

damages is less than the policies' $500 "per-claim" deductible. Alternatively, WHIC is entitled to partial summary judgment regarding:

(1) If the deductible applies only on a "per claimant" basis, then the insured and Asphalt Wizards have the burden of proving that a given claimant received three or more faxes in the same policy year in order to exceed the $1,000 deductible;

(2) The TCPA exclusion contained in the 2006-07 WHIC Policy expressly precludes coverage under that policy;

(3) The "prior publication" exclusion bars any "advertising injury" coverage under the 2005-07 WHIC Policies because it is undisputed the ad was first faxed before these policies incepted; and/or

(4) The faxed ads did not constitute a "products-completed operation" risk, such that the $2 million aggregate limit for products-completed operations risks is inapplicable.

Respectfully submitted,

WALDECK, GOLDSTEIN & PATTERSON, P.A.

By: /s/ Meagan L. Patterson
    Meagan L. Patterson, MO #58234
    5000 W. 95th Street, Suite 350
    Prairie Village, KS 66207
    Telephone: (913) 749-0300/Facsimilie: (913) 749-0301
    E-Mail: meaganp@wgpkc.com

SELMAN BREITMAN LLP

By: /s/ Alan B. Yuter
    Alan B. Yuter (Pro Hac Vice; CA SBN 101534)
    Rachel E. Hobbs (Pro Hac Vice; CA SBN 186242)
    11766 Wilshire Boulevard, Sixth Floor
    Los Angeles, CA 90025
    Telephone: (310) 445-0800/Fax: (310) 473-2525
    E-Mail: ayuter@selmanbreitman.com
    **ATTORNEYS FOR PLAINTIFF/ COUNTERCLAIM DEFENDANT**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 23, 2013, I electronically filed the foregoing document with the Court using the CM/ECF system, which sent notice of electronic filing to the following:

Max Margulis
Margulis Law Group
28 Old Belle Monte Road
Chesterfield, MO 63017
Email: maxmargulis@marguislaw.com

David Oppenheim
Jeffrey Berman
Anderson & Wanca
3701 Algonquin Road, Suite 760
Rolling Meadows, IL 60008
Email: doppenheim@andersonwanca.com
Email: jberman@andersonwanca.com

Barbara Frankland
Rex Sharp
Gunderson Sharp LLP
5301 West 75th Street
Prairie Village, KS 66208
Email: bfrankland@midwest-law.com
Email: rsharp@midwest-law.com

Phillip A. Bock
Bock & Hatch LLC
134 N. LaSalle St., Ste. 1000
Chicago, IL 60602
P: 312.658.5500
Email: phil@bockhatchllc.com
**ATTORNEYS FOR FUN SERVICES**
 **OF KANSAS CITY, INC.**

John Sommer
19049 East Valley View Parkway, Suite B
Independence, MO 64055
johnsommerlaw@sbcglobal.net
**ATTORNEY FOR PARRISH LOVE**
 **d/b/a ASPHALT WIZARDS**

_/s/ Meagan L. Patterson_
**ATTORNEYS FOR PLAINTIFF**